LANGE, Commissioner of Insurance, Respondent, vs.
RANCHER, Appellant.

*October 6, 1952—January 6, 1953.*

For the appellant there was a brief by *William R. Gold* of Milwaukee, and *Delmar Karlen* of Madison, attorneys, and *Frank J. Remington, Glen R. Campbell, Edward J. Coe,* and *Dale R. Thompson* of counsel, all of Madison, and oral argument by *Mr. Gold.*

For the respondent there was a brief by the *Attorney General* and *Stewart G. Honeck,* deputy attorney general, and *E. Weston Wood,* assistant attorney general, and oral argument by *Mr. Wood.*

BROADFOOT, J.    The first subsection of sec. 210.05, Stats., reads as follows:

"(1) Life fund. There is established a 'life fund' to be administered by the state without liability on the part of the

state, beyond the amount of the fund, for the purpose of granting life insurance, with or without total and permanent disability waiver of premium benefits, and annuities to persons who, at the time of the granting of such insurance and annuities, are within the state or residents thereof."

Other subsections of that statute provide for the management of the Fund, and authorize the commissioner of insurance to make rules and regulations necessary to carry out the provisions of the section. It will be noted that the statute authorizes the granting of insurance "to persons who, . . . are within the state or residents thereof." The defendant was, at the time of filing his application, and now is, a resident of the state of Wisconsin. That he is a "person" within the meaning of the statute is too clear for argument.

Plaintiff's entire case is based upon statistics showing the comparative length of life of whites and Negroes. The state proved that the mortality rate of American Negroes is appreciably higher than that of American white persons, and while the difference in the mortality rates of the two races is diminishing, the difference is still substantial. From these statistics the plaintiff draws an inference that the difference in the mortality rate is the result of some inherent difference between the two races.

The plaintiff also proved that for the purpose of life insurance underwriting it is the accepted and customary practice to rate an applicant for insurance according to various characteristics which it is believed in the insurance business have an effect on longevity. Among these characteristics are the applicant's physical condition, occupation, age, habits, morals, medical history, and the medical history of his parents. The applicant is rated by a numerical system, receiving credits for characteristics tending to increase his life expectancy and debits for characteristics tending to decrease his life expectancy. If the applicant's final numerical rating is within a predetermined range the applicant is considered a

standard risk. If the applicant's final numerical rating exceeds the limit of the standard range, the applicant is classified as substandard. The plaintiff uses such a numerical rating system in determining what applicants are to be granted insurance. Concluding that the average mortality rate of American Negroes is approximately fifty per cent higher than that of American whites and that this fact alone would give any Negro applicant a substandard classification, the plaintiff and his predecessors in office have declined to issue insurance in the State Life Fund to any Negro.

The plaintiff offered no proof in support of his inference that the higher mortality rate among Negroes is the result of some inherent difference between them and white persons. The defendant, on the other hand, produced expert testimony, which is not controverted, that physically and biologically white and Negro persons are essentially the same. There is a difference in skin color, form of hair, and facial features, none of which directly affects mortality. The defendant's experts state that the difference in the mortality figures is due mainly to environment, which they define as everything which an individual experiences during his life. This is an oversimplified statement of their testimony, but a complete review thereof would add little to the basic issue.

The trial court was of the opinion that the statute does not prohibit the plaintiff from insuring Negroes, and stated that the plaintiff could, if he deemed certain Negroes to be standard risks, with the exercise of reasonable and proper discretion, accept their applications. The trial court was also of the opinion that the statute does not require the plaintiff to insure Negroes, and that his action in excluding them was not arbitrary or capricious, and cannot be so considered until such time as the mortality rates of the two races become substantially the same or until new methods of classifying risks without regard to race have been devised and accepted in the insurance business.

We do not think that the practices of private insurance companies are controlling in this case. The record discloses that a few private insurance companies grant life insurance to Negroes upon the same basis that they do white persons. Other insurance companies write Negro applicants as substandard risks at a higher premium. Private companies are free to make their own regulations, but when the state law requires the commissioner of insurance to grant a policy to persons who are residents of the state of Wisconsin, he is bound to treat each applicant alike. He is not authorized under his rule-making powers to exclude all Negroes without absolute proof that their length of life is shortened solely because of their color or race.

The plaintiff has failed to show that the racial classification is the only one which will achieve the purposes for which the State Life Fund was created. There is evidence in the record that some Negroes whose applications are properly screened and evaluated would have a mortality equal to that of white persons. Those applicants are entitled to insurance in the State Life Fund.

In this case the plaintiff is not dealing with a group, but with an individual applicant. To say that all white persons are entitled to insurance because as a group they live longer than other persons would not be an acceptable rule. Many of them are refused insurance when they are investigated and evaluated according to the numerical classification used. To say that no Negro can qualify when the same standards are applied to him is equally unacceptable as a rule. The defendant, as a person residing in Wisconsin, has a right to have his application considered. He has a duty to submit to a thorough medical examination and to furnish the plaintiff with all reasonable requests for information that will be of aid in processing his application. The plaintiff is authorized to secure additional information from sources other than the defendant. When all of the information procured is finally

evaluated and applied by means of the numerical rating system, the plaintiff can determine whether or not the defendant is entitled to the insurance applied for. Until then, he cannot do so. His rejection of the application summarily did not comply with the provisions of the statute under consideration.

*By the Court.*—Judgment reversed and cause remanded with directions to enter a judgment not inconsistent with this opinion.

FRITZ, C. J. (*dissenting*). The rejection of Rancher's application for life insurance conformed with the policy established by John R. Lange's predecessors in office, as commissioners of insurance, of classifying all members of non-Caucasian races as "substandard" risks, and refusing insurance to such persons at premiums based upon the American Experience Table of Mortality. Lange commenced this action for declaratory relief as to what is the proper interpretation of sec. 210.05, Stats., and whether it permits or requires the commissioner of insurance and the state board of health to issue insurance to Negroes or other persons not classified as standard risks, at standard premium rates.

Lange alleged in the complaint and on the trial there were established the following facts: For the purpose of life insurance underwriting, it is the accepted and customary practice for an insurer to classify applicants for life insurance; and applicants falling into the class which a particular insurer customarily accepts, and will insure at its standard premiums, are ordinarily referred to as standard risks, and insurers classify applicants falling into classes which are deemed to be subject to higher mortality rates as substandard risks, which applicants are rejected completely or discriminated against in various ways. Each insurer normally excludes from its classification of standard risks applicants who are members of any group, the mortality of which is greater than that of persons deemed standard by the insurer. For the purpose of studying

and determining the mortality experience among life insurance policyholders, as well as among the general population, it is the customary and accepted practice of life insurance companies and of the United States census bureau to classify persons according to races. Negroes living in the United States and as a group, as classified by that bureau, experienced mortality rates substantially in excess of those experienced by American whites as so classified; and groups of American Negroes insured by life insurance companies have as a group experienced mortality rates substantially in excess of those experienced by American whites similarly insured, except at ages in excess of those at which the State Life Fund accepts applicants.

In 1940, the mortality among Negro lives insured was approximately one hundred fifty per cent of the mortality among insured white lives. The excess of the mortality rate of the American Negro over that of the American white person has been decreasing for many years, but the excess is still substantial.

Plaintiff and his predecessors in office have uniformly declined to approve the issuance of life insurance by the State Life Insurance Fund except to those persons whom they have deemed to be standard risks; and have uniformly excluded Negroes from the classification of standard risks because of their higher mortality rates. They have construed sec. 210.05, Stats., as not authorizing them to insure Negro lives at either the standard premium rates provided by that section or at a rate greater than the standard premium. That was done because of the higher mortality rates experienced among Negroes than among those persons whom plaintiff and his predecessors in office have classified as standard risks; and such determinations were based upon reliable actuarial reports.

The State Life Fund is very small in comparison to private life insurance companies. On December 31, 1949, it had

$4,097,600 of insurance in force, and assets in sum of $1,285,-310. It is considered financially unsound for a small insurance organization such as the State Life Fund to depart from accepted underwriting practices in the life insurance business, and the decision of plaintiff and his predecessors in office not to insure Negroes on the ground that they are not classified as standard risks, because of their higher mortality rate, is a reasonable and proper exercise of the discretionary powers vested in the commissioner of insurance by sec. 210.05, Stats.; and such decision is not based upon any prejudice to the Negro race, but is solely because of their mortality rates.

The facts thus established by the evidence warranted the trial court's findings of fact and conclusions:

(1) That sec. 210.05, Stats., requires plaintiff to adopt policies for the determination of standard risks acceptable for insurance in the State Life Fund at standard premium rates.

(2) That the classification of the Negro as a substandard risk established by plaintiff and his predecessors in office for the purpose of determining the eligibility of applicants for insurance in the State Life Fund, is reasonable because it is based upon recent past differences in the mortality rates of Negroes and white persons.

(3) That such classification is germane for the purpose of sec. 210.05, Stats., and does not require plaintiff to issue a policy of life insurance in the State Life Fund at standard premium rates to any person belonging to a classification whose expectancy of life may reasonably be considered to be substantially less than the life expectancy of some persons whom the plaintiff Lange has classified as standard risks.

(4) That sec. 210.05, Stats., does not permit plaintiff to insure any persons at premiums in excess of the standard premiums provided in that section except persons employed in hazardous occupations, in which cases plaintiff is authorized to charge additional amounts over and above the standard premiums in order to compensate for the additional risks arising from such occupations.

(5) That sec. 210.05, Stats., does not permit plaintiff to segregate the portion of the Life Fund arising from insurance

of a certain class of risks, from the respective portions of the Fund arising from the insurance of each other class of risks.

Pursuant to those findings and conclusions, the trial court adjudged:

(1) That sec. 210.05, Stats., does not permit the commissioner of insurance to insure any person in the State Life Fund provided in said section, at premiums in excess of the standard premium rates provided in said section except persons employed in hazardous occupations, in which cases the said commissioner is authorized to charge additional premiums over and above the standard premiums in order to compensate for the additional risks arising from such hazardous occupations.

(2) That sec. 210.05, Stats., does not permit the commissioner to segregate the portion of said State Life Fund arising from insurance of a certain class of risks, from the respective portions the State Life Fund collects from the insurance of each other class of risks.

(3) The classification of Negroes as substandard risks by the commissioner for the purpose of determination of eligibility of applicants for insurance in said State Life Fund is based upon the recent past differences in the mortality rates of Negroes and white persons, which show a substantially higher mortality rate among Negroes than among white persons; and is reasonable in respect to and is germane to the purpose of said sec. 210.05, Stats.

(4) That because of the classification of Negroes as substandard risks for the purpose of insurance in said Life Fund, sec. 210.05, Stats., does not require the commissioner to issue a policy of insurance in said State Life Fund at a standard premium rate to a Negro.

(5) As so construed and interpreted, sec. 210.05, Stats., does not violate sec. 1 of the Fourteenth amendment of the constitution of the United States; and does not violate sec. 1 of article I of the constitution of state of Wisconsin or sec. 41 U. S. C.; and

(6) The defendant, being a member of the Negro race, the commissioner of insurance is not required to cause a physical examination of defendant to be made upon receipt of an appli-

cation from defendant for insurance in said State Fund of insurance.

As the trial court stated:

There is nothing in sec. 210.05, Stats., and its subsections which requires plaintiff to insure Negroes, or that specifically prohibits him from doing so. The only requirements stated in sec. 210.05, Stats., are the following: Insurance may be granted to all persons who at the time of the granting are within the state or residents thereof. (Sec. 210.05 (1).) No insurance shall be granted without a personal medical examination to be made at the direction of the state board of health (Sec. 210.05 (7)); and the premiums for life insurance shall be based upon the American Experience Table of Mortality, etc. (Sec. 210.05 (4).) Of those requirements, much is left to the discretion of the commissioner of insurance and the state board of health, whether insurance should be granted in any given case. Subsection (14) of sec. 210.05, Stats., provides: "Policies of life insurance may be issued upon being approved by the commissioner of insurance and the state board of health," with only a limitation as to the amount for any one risk.

One of the provisions imposed by the legislature is that there is established a Life Fund to be administered by the state without liability on the part of the state, beyond the amount of the Fund. (Sec. 210.05 (1), Stats.) In other words, the state will not subsidize the Fund. This places a responsibility on the commissioner of insurance to keep the Fund solvent, which of course can only be done by careful selection of its risks.

On the trial of the action, plaintiff presented evidence which was not controverted; that it is the accepted and customary practice to rate an applicant for insurance according to various characteristics which it is believed have an effect on longevity; these characteristics are the applicant's physical condition, his occupation, age, medical history, and a medical history of his parents. The applicant is rated by a numerical system, receiving credits for characteristics tending to increase his life expectancy, and debits for characteristics tending to decrease it. If the applicant's final numerical rating is within a predetermined range, the applicant is considered a

standard risk; if the applicant's final numerical rating exceeds the limit of the standard range, the applicant is classified as a substandard risk, and is either denied insurance or is accepted only on a substandard basis, and at a premium greater than the standard premium, depending upon the practice of the particular insurance company. In administering the State Life Fund, plaintiff and his predecessors in office have construed sec. 210.05, Stats., as vesting in them no power or authority to establish a substandard department for the issuance of life insurance to persons whom they considered substandard risks.

The known facts as to mortality rates of the American Negroes demonstrate that they have for many years experienced a mortality rate substantially in excess of the mortality rate of American white persons. A difference exists whether the comparison is made between insured Negro lives and insured white lives, or between the total Negro population and the total white population of the United States. The reason for the higher mortality rate among Negroes than among whites is not clear. Considerable testimony was received at the trial tending to show that such higher mortality rate was due to environmental rather than physical differences. Learned and eminent anthropologists and geneticists testified at the trial that race had nothing to do with length of life; that it was due to poor environmental conditions under which the Negroes live; and that the only differences between the Negro and white are superficial, such as skin pigmentation, hair texture, and the absence among Negroes in Africa of the RH negative gene; but that none of those differences is known to have an appreciable effect upon the mortality rates of the two races.

While such testimony may be persuasive, the trial court was of the opinion that it still is inconclusive as to whether or not the greater mortality of the one race may be due in part to physiological differences between the races. The reason for such conclusions is based upon the fact that large private insurance companies have not adopted this theory, and it is the practice of life insurance companies generally, that insure both white and Negro lives, to differentiate between them, either by charging a higher premium for insuring

Negroes, or allowing a lesser commission to agents for selling insurance to Negroes, and limiting the solicitation of Negroes; that discrimination is due entirely to the known mortality rates of the two races.

The commissioner of insurance has not been authorized by statute to establish a substandard department for substandard risks, and in the absence thereof, there would be violated the provision in sec. 210.05 (4), Stats., which provides that: "The premiums for life insurance in the Life Fund shall be based upon the American Experience Table of Mortality with additions for extra hazards. . . ."